UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                                               :
**JAMES SNOKE**,                                               :
                                                               :
                          Plaintiff,                           :
                                                               :    **MEMORANDUM DECISION AND**
                                                               :    **ORDER**
               – against –                                     :
                                                               :    22-CV-3708 (AMD)
                                                               :
**COMMISSIONER OF SOCIAL SECURITY**,                           :
                                                               :
                          Defendant.                           :
--------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The plaintiff challenges the Social Security Commissioner's decision that he was not

disabled for the purpose of receiving Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") under Titles II and XVI of the Social Security Act.  (ECF No. 17-1 at

1.)  For the reasons set forth below, the Court denies the Commissioner's motion for judgment

on the pleadings, grants the plaintiff's cross-motion and remands the case for further

proceedings.

## BACKGROUND

The plaintiff applied for DIB and SSI on January 12, 2018, alleging disability since

January 31, 2017, when he fell from a crane and injured his back.  (Administrative Transcript

("Tr.") 50, 69, 78, ECF No. 11.)  He also suffered from depression, had two different hernias,

and nerve problems in his right arm, hand, and fingers.  (Tr. 69, 78.)  After the Social Security

Administration ("SSA") denied his claim on June 18, 2018 (Tr. 96), the plaintiff requested a

hearing on August 15, 2018 (Tr. 104–05).  ALJ Lisa Raleigh held a telephonic hearing on

November 22, 2019, at which a vocational expert ("VE") and the plaintiff—who was represented

by counsel—testified.  (Tr. 34.)  In a December 2, 2019, decision, ALJ Raleigh determined that the plaintiff was not disabled and denied his claims.  (Tr. 18–30.)

The Appeals Council denied plaintiff's request for review on August 19, 2020, rendering the ALJ's denial the "final decision" of the Commissioner and subject to judicial review.  (Tr. 1-3.)  On February 23, 2021, the plaintiff filed a request to reopen and change the Appeals Council's decision, which the Appeals council denied on May 19, 2021.  (Tr. 4.)  The plaintiff filed this action on June 21, 2022 (ECF No. 1), and both parties moved for judgment on the pleadings (ECF Nos. 10, 14).

## I.    Benefits Assessment Under the Social Security Act

A person is disabled for purposes of Titles II and XVI of the Social Security Act[1] if he cannot engage in substantial gainful activity because of a physical or mental impairment that has lasted or is expected to last for at least 12 months.  42 U.S.C. § 423(d)(1)(A); *McIntyre v. Colvin*, 758 F.3d 146, 149–50 (2d Cir. 2014) (quoting *Cichocki v. Astrue*, 729 f.3d 172, 176 (2d Cir. 2013)).  That means that to qualify for benefits under the Act, a claimant must be unable to do his previous work or any other kind of work.  *Dousewicz v. Harris*, 646 F.2d 771, 772 (2d Cir. 1981).  To qualify for disability insurance benefits, the claimant must demonstrate that he was disabled as of the date he was last insured.  *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citing 42 U.S.C. § 423(a)(1)(A)).

An ALJ uses a five-step sequential evaluation process to decide whether a claimant satisfies this standard.  At the first step, the ALJ determines whether the claimant is currently

---

[1] The requirements for establishing disability under Title II, 42 U.S.C. § 423(d), and Title XVI, 42 U.S.C. § 1382c(a)(3), are identical, so that "decisions under these sections are cited interchangeably."  *Donato v. Sec'y of Health & Human Servs.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citing *Hankerson v. Harris* 636 F.2d 893, 895 n.2 (2d Cir. 1980)).

engaged in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not, the ALJ must next determine whether the claimant has a "severe impairment" that significantly limits his ability to do basic work activities. *Id.* § 404.1520(a)(4)(ii). If the claimant has a severe impairment, the ALJ must then decide whether the impairment is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If it is, the ALJ will presume that the claimant is disabled. *Id.* § 404.1520(a)(4)(iii). If the impairment is not listed, the ALJ must assess the claimant's residual functional capacity ("RFC")—his ability to work on a sustained basis despite the impairments. At step four, the ALJ must determine whether the claimant has the RFC to perform his past work. *Id.* § 404.1520(a)(4)(iv). Finally, if the claimant cannot do his previous work, the ALJ must determine whether he can do another job. *Id.* § 404.1520(a)(4)(v).

"The claimant has the general burden of proving that he . . . has a disability within the meaning of the Act, and bears the burden of proving his . . . case at steps one through four . . . ." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citations omitted). At the last step, however, "the burden shifts to the Commissioner to show there is other work that the claimant can perform." *McIntyre*, 758 F.3d at 150 (cleaned up).

## II.     The Record Before the ALJ

The ALJ reviewed the plaintiff's medical records and his doctors' treatment notes, consultative medical opinions, and hearing testimony from the plaintiff and the VE.

### a.     Medical Records and Treatment Notes

On January 31, 2017, the day of his accident, the plaintiff went to New York-Presbyterian Brooklyn Methodist Hospital to get an x-ray of his left knee, which showed no fracture or dislocation. (Tr. 325–27.) The plaintiff was subsequently treated at Healthcare Associates in Medicine from February to October 2017 (Tr. 299–324), then by neurologist Igor Stiler, M.D., P.C. from June to September 2017 (Tr. 288–94), and at Regional Orthopedics from

3

March to September 2019 (Tr. 341–60). Dr. Feroze Tejani and a chiropractor also treated him, but the record does not establish the length or frequency of either treatment. (*See, e.g.*, Tr. 305.)

i.    *Healthcare Associates in Medicine*

The plaintiff first visited Healthcare Associates on February 1, 2017, complaining of moderate pain in his left knee, lower back, pelvis, buttock, and right elbow; he felt the pain "at rest, with activities, and at night." (*Id.*) Physician Assistant Lauren Pirozzi evaluated the plaintiff's symptoms and noted that he had a "[l]eft elbow and arm strain," "left knee strain," "thoracic and lumbar strain and possible injury to the pubic symphysis." (Tr. 306.) X-rays of his right elbow, lumbar spine and pelvis showed no fracture; a previous x-ray of his left knee, which Pirozzi viewed on a disc, also showed no fracture or abnormality. (*Id.*) Pirozzi recommended MRI scans of his left knee and pelvis. (*Id.*)

The plaintiff visited Healthcare Associates one more time on April 3, 2017, and was treated by John P. Reilly, MD. (Tr. 305.) Dr. Reilly wrote that the pelvis and left knee MRIs showed no evidence of fractures or tears and that the right elbow X-ray elbow was "unremarkable." (*Id.*) He noted that the plaintiff's chiropractor requested an MRI of the lumbar spine, which showed mild degeneration and herniated discs. (*Id.*) He also mentioned that the plaintiff saw Dr. Tejani about a hernia after the January 31, 2017 fall. (*Id.*) Dr. Reilly concluded that the plaintiff "remains totally disabled and unable to work." (*Id.*) The doctor prescribed an anti-inflammatory medication and recommended that the plaintiff get an MRI of his right elbow, which he did on April 18, 2017. (*Id.*) The MRI showed "common extensor tendinosis" and "small joint effusion." (Tr. 309–10.)

ii.    *Dr. Igor Stiler, M.D., P.C.*

The plaintiff did not return to Healthcare Associates in Medicine; he wrote in a Disability Report that he followed up with Dr. Tejani and Dr. Stiler instead.[2]  (Tr. 197.)  On July 10, 2017, Dr. Stiler diagnosed the plaintiff with "traumatic cervical myeloradiculopathy" and "traumatic lumbar radiculopathy."  (Tr. 291.)[3]  The plaintiff had tenderness and spasms in his spine, tingling in his right hand when he turned his head to the left, lower than normal range of motion for certain movements, "4+/5 hand grip" and tremor in his right fingers, as well as "diminished pinprick and light touch sensation" in his right arm.  (Tr. 290–91.)  Dr. Stiler did not diagnose the plaintiff with any mental condition or make any notes about his mental health.  (Tr. 289.)

In his July 10, 2017 treatment notes, Dr. Stiler wrote that after the January 31, 2017 accident, the plaintiff "was found to have a right inguinal and umbilical hernia[s]" and "ultimately had to have surgery for [them]."  (*Id.*)  The plaintiff had also received "chiropractic treatment."  (*Id.*)

At his September 11, 2017 appointment, the plaintiff complained of "increasing pain in his mid-thoracic region between the shoulder blades," "persistent neck pain mostly of the left side radiating to the shoulder and upper back," and "pain across his lower back radiating to the legs."  (Tr. 292.)  Dr. Stiler diagnosed the plaintiff with "thoracic myeloradiculopathy."  (Tr.

---

[2] Although the plaintiff reported that he first saw Dr. Stiler on June 8, 2017 (Tr. 197), the record includes Dr. Stiler's treatment notes from only July 10, 2017 and September 11, 2017 (Tr. 289–98).  It is not clear if the plaintiff saw Dr. Stiler after the September 11, 2017 appointment.  The plaintiff testified that he moved from Staten Island, where Dr. Stiler practiced, in October 2017.  (Tr. 43.)

There are no treatment notes or medical records from Dr. Tejani in the record.

[3] The record does not define these diagnoses; on remand, the parties should explain them in terms understandable to a layperson.

293.)[4]  He gave the plaintiff "trigger point injections" in his spine, ordered additional tests, and recommended that the plaintiff continue with physical therapy.[5]  (Tr. 293–94.)

In both the July 10, 2017 and September 11, 2017 treatment notes, Dr. Stiler wrote that the plaintiff "has a TEMPORARY TOTAL DISABILITY."  (Tr. 291, 294.)

Dr. Stiler recommended that the plaintiff get an electromyography ("EMG") and a nerve conduction velocity ("NCV") test of his arms, legs, and the cervical and lumbar regions of his back, which he had on October 3, 2017.  (Tr. 293, 316–17.)  According to Dr. Stephen Kulick of Healthcare Associates in Medicine, the tests showed no evidence of cervical and lumbar radiculopathy, entrapment neuropathy or peripheral neuropathy.  (Tr. 317.)

### iii.    Regional Orthopedics

The plaintiff went to Regional Orthopedics eight times between March 6, 2019 and September 16, 2019.  (Tr. 341, 343, 344, 347, 350, 353, 355, 358.)[6]  The plaintiff reported similar symptoms at each visit—pain in his thoracic spine, lumbar region, right elbow, and right arm, numbness and tingling—that were aggravated by physical activity.  He also said that the pain got worse when he wrote more than three sentences and that he had "weakness with holding objects," but that his "[f]unctional impairment" was "mild"—he was "aware of it" but it did not "interfere with daily activities," although it "regularly" interfered with his sleep.  (*See, e.g.*, Tr. 353.)  According to the treatment notes, his thoracic spine, lumbar spine, SI joint, and right elbow and forearm were "mild[ly]" or "moderate[ly]" "tender[]."  (*See, e.g.*, Tr. 357.)  According to the March 8, 2019 treatment notes, an EMG study of the plaintiff's right arm

---

[4] *Id.*

[5] The record does not include any physical therapy records or treatment notes.

[6] While Regional Orthopedics' treatment notes do not identify which medical provider treated the plaintiff at these appointments, it appears that the plaintiff saw Dr. Syed Husain at least twice (Tr. 347, 355), "Dr. Quirno" at least twice (Tr. 355, 358), and "Dr. Chapman" at least once (Tr. 350).

showed "[m]ild right sensory median nerve neuropathy . . . [c]onsistent with [a] diagnosis of carpal tunnel;" the plaintiff was prescribed baclofen and gabapentin.  (Tr. 347.)

The plaintiff appeared to be "[w]ell developed, well nourished and groomed;" he was not in "apparent acute or chronic distress," and his "mood and affect" was "normal and appropriate to the situation."  (*See, e.g.*, Tr. 354–55.)  In addition, the treatment notes characterized the plaintiff's work status as "unable to work" and his disability level as "total = 100%."  (Tr. 343, 347, 350, 353, 355, 357, 360.)

At a September 12, 2019 appointment, the plaintiff said his thoracic spine pain was not improving.  (Tr. 352, 355.)  Doctors Husain and Quirno explained that he could have spinal surgery or a medial branch block; the plaintiff opted for the medial branch block.  (Tr. 355, 360.)  According to the treatment notes, the plaintiff "failed conservative treatment including PT and NSAIDs" and that his MRI showed multi-level spondylosis and herniated discs which "caus[ed] [the plaintiff] to have limitations with sitting and standing for prolonged periods of time."  (Tr. 360.)  The plaintiff got the medial branch block in order "to reduce pain" so that the plaintiff could improve his ability to "sit[] and driv[e] for prolonged periods of time (2+ hours) without pain."  (*Id.*)  He also got an injection in his right elbow.  (*Id.*)

**b.   Consultative Opinions**

*i.   Dr. Amy Griswold, M.D.*

The consultative neurologist, Dr. Griswold, examined the plaintiff on May 16, 2018.  (Tr. 329.)  In her treatment notes, she noted that the plaintiff complained of moderate pain in his neck, upper and lower back, left knee, right abdomen, and right elbow, forearm, wrist, hand, and fingers.  (Tr. 329–30.)  The plaintiff described his pain level as an eight out of ten, and that "standing, sitting, bending, walking, and activities aggravate[] or worsen[] his condition."  (Tr. 330.)  The plaintiff said that these symptoms "began from an unknown origin [on] 01/03/2017,"

7

that he had not been treated for them, and that he had not previously had these problems.  (Tr. 330.)  The plaintiff could do most neurological tests, except for the "heel to shin test" with his right leg.  He had "no muscle weakness" in his upper or lower extremities, could "zip, button and tie without difficulty," could "write with a pen," and had "5/5 grip strength" for both hands.  (Tr. 332–33.)  She also noted that the plaintiff had "[n]o muscle spasms."  (Tr. 333.)  The plaintiff was "[c]oherent and alert."  (Tr. 331.)

According to Dr. Griswold, the plaintiff's primary diagnoses were "[m]oderately chronic" cervical disc disorder with myelopathy in the mid-cervical region, intervertebral disc disorders with myelopathy in the thoracic region, other intervertebral disc degeneration in the lumbar region, obesity, and "possible BPH."  (Tr. 333.)[7]  The secondary diagnoses were moderately chronic pain in the thoracic spine, radiculopathy in the thoracic and lumbar regions, low back pain, history of hypertension, and possible anxiety, depression, chronic pain, and right cubital tunnel syndrome, as well as "[m]ildly chronic" cervicalgia, "[p]ossible DJD," and "[p]ossible IBS."  (*Id.*)[8]

ii.     *Dr. Daniel Van Ingen, Psy.D.*

Dr. Van Ingen, the consultative psychologist, examined the plaintiff on June 8, 2018.  (Tr. 337.)  The plaintiff told Dr. Van Ingen that he had "difficulty coping with [the] continued discomfort" from his physical conditions, had "depressed moods, low motivation, and low energy," struggled to fall and stay asleep, and had "difficulty with racing thoughts" and "chronic worrie[s];" Dr. Van Ingen found that these symptoms were "more consistent with anxiety."  (*Id.*)

---

[7] The record does not define "BPH."

[8] The record does not define "DJD" or "IBS."

The plaintiff's attention and concentration skills and his recent and remote memory skills were "intact," his cognitive functioning was "average" with "a high level of mechanical intelligence" consistent with his job history, and his insight and judgment were "fair to good." (Tr. 338–39.)  The plaintiff was "cooperative" with the mental health examination and his "manner of relating and social skills were adequate," but his mood was "dysphoric."[9]  (Tr. 337.)

Dr. Van Ingen found "no evidence" that the plaintiff had limitations in understanding, remembering, or applying "simple directions and instructions," using "reason and judgment to make work-related decisions," "sustain[ing] concentration and perform[ing] a task at a consistent pace," and being "aware of normal hazards and take appropriate precautions." (Tr. 339.)  The plaintiff was "mildly limited" in his ability to "understand, remember, or apply complex directions and instructions," "interact adequately with supervisors, co-workers, and the public," "sustain an ordinary routine and regular attendance at work," and "maintain personal hygiene and appropriate attire." (*Id.*)  Finally, he found that the plaintiff was "moderately limited" in his ability to "regulate emotions, control behavior, and maintain well-being." (*Id.*)  Dr. Van Ingen diagnosed the plaintiff with "[u]nspecified anxiety disorder" and "[t]obacco use disorder;" the examination results were "consistent with psychiatric problems," but "in itself, this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (Tr. 340.)  He recommended that the plaintiff get medical treatment, including physical therapy, for his physical problems, as well as psychological counseling for six months. (*Id.*)

### iii.    State Agency Psychological Consultant

The state agency psychological consultant, Gildegardo Alidon, M.D., reviewed the record on June 13, 2018 and concluded that the plaintiff's mental impairments were not severe. (Tr. 28,

---

[9] Upon remand, the parties should obtain a definition of "dysphoric" for the record.

74, 84.)[10]  He found that the plaintiff "acknowledge[d] the mental ability to perform [a] broad array" of routine activities of daily living "within his physical restrictions."  (Tr. 84.)  The plaintiff "may experience some anxiety and[/]or depressive mood[s] at times," but he was "fully functional from a mental health perspective"—he could "reside independently," "relate in a socially appropriate manner and display an overall adequate mental status (with no significant cognitive deficits)."  (*Id.*)  The plaintiff reported no history of psychiatric hospitalization and did not take psychiatric medications but reported to the SSA that he had been treated for depression at Touchstone Rehab.  (*Id.*)

### c.  Vocational Expert's Testimony

VE John Black testified at the November 22, 2019 hearing.  (Tr. 34, 61–66.)  The ALJ asked him to assume a hypothetical individual of the plaintiff's age, education, and work history, who was limited to "light work" and could "frequently stoop and frequently handle and finger with the right hand."  (Tr. 63.)  Based on this hypothetical, the VE testified that the plaintiff could not go back to his previous job as an automobile mechanic but could work as a routing clerk, ticket taker, or a convenience store clerk.  (Tr. 63–64.)  The VE estimated that there were 289,000 jobs in the national economy at which the plaintiff could work.  (*Id.*)

The plaintiff's attorney asked the VE whether his conclusion would change if the hypothetical person could only occasionally "handle and finger" with the right hand.  (Tr. 64.)  The VE testified that his opinion would not change because the person could use his left hand,

---

[10] Dr. Alidon reviewed the record twice, once for the DIB claim and once for the SSI/DI claim.  (Tr. 68 (Disability Determination Explanation for the DIB claim); Tr. 77 (Disability Determination Explanation for the DI claim).)  He found that there was "insufficient evidence" to form an opinion about the plaintiff's limitations through the date last insured.  (Tr. 74–75.)  In evaluating the SSI/DI claim, he appears to have considered the records from the plaintiff's July 10, 2017 appointment with Dr. Stiler, the February 5, 2018 report that he was treated for depression at "Touchstone Rehab," and the June 8, 2018 psychological consultative examination with Dr. Van Ingen.  (Tr. 78–81, 83–84.)

and use his right hand occasionally.  (*Id.*)  The VE also testified that there were no jobs for someone whose exertional level was "sedentary" and who could only occasionally handle and finger with the right hand.  (Tr. 65.)

### d.      Plaintiff's Hearing Testimony

The plaintiff testified at the November 22, 2019 hearing.  (Tr. 38–61.)  He lives in Sarasota, Florida at his mother's house, and rents out a spare room to a friend.  (Tr. 57–59.)[11]  He spends "[a] lot of time[]"watching television, and "rotate[s] constantly" between sitting, often with his legs elevated, standing, and lying down to accommodate his pain.  (Tr. 54, 59–60.)  He tries to "get out and just do things to clear [his] mind," like going to a car show.  (Tr. 59.)  He has trouble falling and staying asleep at night, averaging two and a half to three hours a night, and sleeps for about the same amount of time during the day.  (Tr. 60.)  He does household chores when his mother is not there but has difficulty with cleaning; his roommate handles outdoor chores.  (Tr. 57–58.)  He can drive short distances, shops for groceries every two weeks from 15 to 20 minutes, and runs other errands including going to the bank.  However, "repetitive motions," "like carrying groceries from the car into the house" and writing more than three or four lines aggravate his arm and hand pain.  (Tr. 55–56, 58.)  He used to be a "thrill seeker" and enjoyed riding dirt bikes and rollercoasters.  (Tr. 61.)  He no longer rides dirt bikes, and when he does go on a rollercoaster, he is "in pain for days."  (*Id.*)  He tries to do other activities, but is limited, depending on the type and cost of the activity.  (Tr. 59.)

The plaintiff's pain "stays at an 8 pretty consistently."  (Tr. 54.)  He has consistently taken anti-inflammatory medication and muscle relaxers, even when he was not in treatment; the medications "kind of ease[]" things and "[s]ometimes let[] [him] sleep," but he has not "see[n]

---

[11] The plaintiff's mother lives in the house less than half the year.  (Tr. 57–59.)

improvement." (Tr. 52.)  At the time of the hearing, he had not yet started physical therapy

because he only recently received worker's compensation insurance.  (Tr. 51–52.)

## III.    The ALJ's Opinion

The ALJ concluded that (1) the plaintiff had not engaged in substantial gainful activity

since January 31, 2017, the alleged onset date, (2) the plaintiff's severe impairments included

degenerative disc disease, traumatic cervical myeloradiculopathy, thoracic myeloradiculopathy,

traumatic lumbar radiculopathy, carpal tunnel syndrome of the right upper extremity, lateral

epicondylitis of the right elbow, degenerative joint disease of the left knee, and obesity, and that

(3) those impairments, whether considered individually or in combination, did not meet or equal

any of those listed in Appendix 1 of the regulations.  (Tr. 20, 22.)  The ALJ determined that the

plaintiff retained the residual functional capacity ("RFC") to perform "light work," "except that

he can frequently stoop, and frequently handle and finger with his right dominant hand."  (Tr.

23.)  She found that the medical record did not "corroborate the severity" of the plaintiff's

conditions as he reported them or reflect substantial changes in diagnoses, repeated

hospitalizations, or significant worsening of symptoms.  (Tr. 24.)

In making this determination, the ALJ did not give any weight to Healthcare Associates

in Medicine's treatment notes or medical records, or to Regional Orthopedics' opinion that the

plaintiff was unable to work.  (*See* Tr. 25, 28.)  She dismissed Dr. Stiler's opinion that the

plaintiff had "temporary total disability" as minimally persuasive because the opinion was

"extreme in nature and simply unsupported by his treatment records."  (Tr. 28.)  Those records

showed that the plaintiff had full strength in every muscle group except his right hand, which had

slightly less than full strength.  (*Id.*)  She also found Dr. Stiler's opinion was inconsistent with

"the medical record as a whole," including the consulting neurologist's assessment, which did

not identify any significant limitations.  (*Id.*)

The ALJ found Doctors Griswold and Van Ingen's consultative opinions "persuasive" because they were "supported by clinical examinations and testing" and "largely consistent with the record as a whole."  (*Id.*)[12]  She found Dr. Alidon's opinions for the SSI claim persuasive for the same reasons.  (*Id.*)  However, she found Dr. Alidon's finding for the DIB claim—that there was "insufficient evidence" to form an opinion on the plaintiff's limitations through the date last insured—to be "minimally persuasive" because it was "not reflective of the totality of the evidence;" he did not "review[] all the evidence received at the hearing level."  (*Id.*)  Nevertheless, the ALJ explained, she could form an opinion on the plaintiff's limitations through the date last insured based on the full record, to which Dr. Alidon had not had access.  (*Id.*)

Finally, citing the VE's testimony, the ALJ ruled that the plaintiff could not do his past relevant work as a mechanic (Tr. 29), but could do other jobs, including routing clerk, ticket taker, and convenience store clerk (Tr. 30).

## STANDARD OF REVIEW

A district court reviewing the Commissioner's disability decision must determine "whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005).  "[S]ubstantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted).

---

[12] The ALJ also noted that the SSA regulations "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  (Tr. 28.)

"Although factual findings by the Commissioner are 'binding' when 'supported by substantial evidence,' '[w]here an error of law has been made that might have affected the disposition of the case,'" the court will not defer to the ALJ's determination. *Pollard v. Halter*, 377 F.3d 183, 188–89 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). Thus, "[e]ven if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). Moreover, the district court should remand if "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (citations omitted).

## DISCUSSION

The plaintiff argues that the ALJ's decision was not supported by substantial evidence because she did not resolve inconsistencies in Dr. Van Ingen's testimony, consider the plaintiff's ability to do "sustained work-related . . . mental activities," or ask the VE to consider the plaintiff's mental impairments in determining what jobs the plaintiff could do. Although the plaintiff does not appear to argue that the ALJ did not fully develop the record, a district court must "independently consider" this question as "a threshold matter." *See Sanchez v. Saul*, No. 18-CV-12102, 2020 U.S. Dist. LEXIS 7182, at *66 (S.D.N.Y. Jan. 13, 2020), *report & recommendation adopted*, 2020 U.S. Dist. LEXIS 49938 (S.D.N.Y. Mar. 20, 2020).

## I.   The ALJ Did Not Fully Develop the Record

### a.   The ALJ Did Not Obtain Necessary Treatment Notes

Because of the non-adversarial nature of these proceedings, "even when . . . the claimant is represented by counsel," an ALJ has "regulatory obligations to develop a complete medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.

1996); *see* 20 C.F.R. § 416.912(b)(1).  "The duty to develop the record is particularly important

where an applicant alleges he is suffering from a mental illness, due to the difficulty in

determining whether these individuals will be able to adapt to the demands or stress of the

workplace."  *Merriman v. Colvin*, No. 14-CV-3510, 2015 U.S. Dist. LEXIS 124691, at *48

(S.D.N.Y. Aug. 14, 2015) (quoting *Hidalgo v. Colvin*, No. 12-CV-9009, 2014 U.S. Dist. LEXIS

86928, at *11 (S.D.N.Y. June 25, 2014) (cleaned up)), *report and recommendation adopted*,

2015 U.S. Dist. LEXIS 124459 (S.D.N.Y. Sept. 16, 2015).  "ALJs should not rely heavily on the

findings of consultative physicians after a single examination" of the plaintiff's mental health

because "a one-time snapshot of a claimant's status may not be indicative of [their] longitudinal

mental health."  *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019).

    The SSA was aware that "Touchstone Rehab" treated the plaintiff.[13]  In a February 5,

2018 "report of contact" form, an SSA employee noted that the plaintiff "advised that he was

treated for his depression shortly at Touchstone Rehab before his worker's comp benefits were

ceased;" the plaintiff also gave the SSA a phone number.  (Tr. 202.)  According to the form, the

"next action" was "MER requested," which suggests that the employee requested the plaintiff's

records from Touchstone Rehab.

    Moreover, the June 18, 2018 initial Disability Determination Explanations document that

"Touchstone Rehabilitation" was a "Source of Evidence," and suggest that the SSA requested

---

[13] The "treating physician rule" does not apply because the plaintiff filed his claims on January 12, 2018.
*See* 20 C.F.R. § 404.1520c.  The Commissioner "will not defer or give any specific evidentiary weight,
including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),
including those from [the claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a).  However,
the regulations "still recognize the 'foundational nature' of the observations of treating sources, and
'consistency with those observations is a factor in determining the value of any [treating source's]
opinion.'"  *Soto v. Comm'r of Soc. Sec.*, No. 19-CV-4631, 2020 U.S. Dist. LEXIS 181068, at *11
(E.D.N.Y. Sept. 30, 2020) (quoting *Shawn H. v. Comm'r of Soc. Sec.*, No. 19-CV-113, 2020 U.S. Dist.
LEXIS 123589, at *19 (D. Vt. July 14, 2020)).

Touchstone's records on February 5, 2018 and February 19, 2018.  (Tr. 73, 81.)  Nevertheless, the ALJ did not get the records.  The defendant has not explained "what efforts were specifically made," "what communication was sent," or "whether there was any follow-up" in connection with these records.  *Calderon v. Comm'r of Soc. Sec.*, No. 16-CV-9002, 2018 U.S. Dist. LEXIS 36735, at *30 (S.D.N.Y. Mar. 5, 2018), *report and recommendation adopted*, 2018 U.S. Dist. LEXIS 48326 (S.D.N.Y. Mar. 23, 2018).  Nor did the ALJ refer to Touchstone Rehabilitation in the hearing or her decision.  "Without knowing more about the efforts the Commissioner made, it is impossible for the Court to assure itself that the proper efforts were made to develop the Record."  *Id.*; *see also Graham v. Colvin*, No. 13-CV-728, 2014 U.S. Dist. LEXIS 98675, at *8–10 (W.D.N.Y. July 20, 2014) (finding that the court could not determine whether the record was developed where only evidence of Commissioner's attempt to develop the record was a "cryptic" internal worksheet); *Daniela B. v. Kijakazi*, No. 22-CV-3495, 2023 U.S. Dist. LEXIS 93791, at *29 n.3 (E.D.N.Y. May 30, 2023) (finding that the court could not determine whether the record was developed where the only evidence of record requests was in the disability determination explanation, which the court found suggested that the requests were made "by the consultative examiners completing the disability determinations, and not the ALJ").  It was especially important that the ALJ obtain these records because Dr. Van Ingen's consultative opinion is the only other mental health examination in the record, and ALJs should not rely heavily on a "one-time snapshot" of the plaintiff's mental health.  *Estrella*, 925 F.3d at 98.

Nor did the ALJ have medical records from Dr. Feroze H. Tejani, who apparently treated the plaintiff for two hernias.  (*See, e.g.*, Tr. 195.)  The ALJ was aware that Dr. Tejani treated the plaintiff; the plaintiff listed him as one of his doctors in a January 16, 2018 disability report (*id.*) and Dr. Reilly's April 3, 2017 treatment notes state that the plaintiff saw him "about a hernia

after the fall" (Tr. 305).[14]  The Disability Determination Explanations also refer to Dr. Tejani.
(Tr. 73, 81.)  On remand, the ALJ should request medical records from Dr. Tejani.

### b.    The ALJ Did Not Resolve Inconsistencies in the Record

As explained above, the ALJ concluded that Dr. Stiler's opinion that the plaintiff was
"temporarily totally disabled" was only "minimally persuasive" because it was "extreme in
nature and scope and simply unsupported by his treatment records" and the medical records as a
whole.  (Tr. 28.)  The ALJ noted that Dr. Stiler's opinion conflicted with his assessment that the
plaintiff "had 5/5 muscle strength in every muscle group tested in the bilateral upper and lower
extremities with the exception of right hand strength which was 4+/5" (Tr. 26), and with Dr.
Griswold's neurological assessment that the plaintiff had no muscle weakness or spasms (Tr.
28).  However, she did not discuss Dr. Stiler's observations that the plaintiff suffered from spinal
pain and spasms, or explain why those observations were not sufficient support for his opinion.

An ALJ does not have to resolve all inconsistencies in the record, but she must develop
the record, which includes recontacting a treating physician if necessary to resolve "obvious
gaps" in the record.  *See Beckman v. Comm'r of Soc. Sec.*, No. 21-CV-1492, 2022 U.S. Dist.
LEXIS 172662, at *11–12 (E.D.N.Y. Sept. 23, 2022) (collecting cases).  Gaps in the record can
be caused by missing medical evidence, but inconsistencies or vagueness in an opinion can also
create gaps and trigger a duty to develop the record further.  *See Madera v. Comm'r of Soc. Sec.*,
No. 20-CV-1459, 2021 U.S. Dist. LEXIS 188889, at *16–17 (E.D.N.Y. Sept. 30, 2021)
(remanding because the ALJ determined that a consultative examiner's opinion was "vague");

---

[14] Doctors Stiler and Van Ingen wrote that the plaintiff had hernia surgery in 2017 (Tr. 289, 337), but
the record does not include any additional information about the procedure.  "Failure to include records of
a surgical procedure during the relevant time period is a failure to develop the record that merits
remand."  *Beckman v. Comm'r of Soc. Sec.*, No. 21-CV-1492, 2022 U.S. Dist. LEXIS 172662, at *15
(E.D.N.Y. Sept. 23, 2022) (citing *Dillon v. Comm'r of Soc. Sec.*, No. 17-CV-4136, 2018 U.S. Dist.
LEXIS 154897, at *49–50 (S.D.N.Y. Sept. 7, 2018)).

*Lee v. Saul*, No. 19-CV-9451, 2020 U.S. Dist. LEXIS 151404, at *47 (S.D.N.Y. Aug. 19, 2020)

("Although [the treating physician's] assessments setting forth [the plaintiff's] functioning levels

were brief, and arguably vague, the appropriate solution was not to reject the opinions contained

therein on that basis, but rather to recontact [the treating physician] in an effort to have him

clarify any ambiguities."), *report and recommendation adopted*, 2020 U.S. Dist. LEXIS 164858

(S.D.N.Y. Sept. 8, 2020).

Dr. Stiler's was the only treating physician's opinion that the ALJ considered; she

concluded that his opinion was inconsistent with his examination notes.  This inconsistency is a

gap that requires further development of the record. *Beckman*, 2022 U.S. Dist. LEXIS 172662,

at *13; *see also, e.g.*, *Weiss v. Comm'r of Soc. Sec.*, No. 19-CV-5916, 2021 U.S. Dist. LEXIS

96747, at *44 (E.D.N.Y. Mar. 23, 2021) ("[I]f some of [the psychologist's] treatment notes and

opinions were inconsistent, the ALJ should have developed the record and sought clarification in

view of the perceived inconsistencies.").  This is especially so because Dr. Stiler stated only that

the plaintiff "has" or "is considered to have" "a temporary total disability," and did not describe

specific functional limitations.  (Tr. 291, 294.) *Cf. Isernia v. Colvin*, No. 14-CV-2528, 2015 U.S.

Dist. LEXIS 126871, at *10 (E.D.N.Y. Sept. 22, 2015) (remanding where the ALJ characterized

the treating physician's opinion as vague, and "specifically stated [that] he wished [the

physician] had provided[] a function-by-function assessment of [the] plaintiff's

various . . . limitations").

## II.     The ALJ's Evaluation of The Medical Opinions

The plaintiff contends that the ALJ's decision about his mental impairments was not

supported by substantial evidence and that the ALJ did not apply the appropriate legal standards.

(ECF 17-1 at 1.)

First, the plaintiff challenges Dr. Van Ingen's opinion—that the plaintiff's "psychiatric problems," including an unspecified anxiety disorder, did not "appear to be significant enough to interfere with [his] ability to function on a daily basis" (Tr. 339–40)—as inconsistent with his finding that the plaintiff was "moderately limited in his ability to regulate emotions, control behavior, and maintain well-being" (Tr. 339), and that the ALJ should have addressed this inconsistency (ECF No. 17-1 at 4–5). The ALJ dismissed this moderate limitation finding and determined that the plaintiff's "ability to engage in basic daily chores and activities implies that his mental restrictions are minimal and inconsequential." (Tr. 21.) The plaintiff argues that the moderate limitation is "a substantial impediment to appropriate interaction with supervisors, co-workers, and the general public." (ECF No. 17-1 at 6.)

"It is entirely proper for the ALJ to only credit portions of medical source opinions, or weigh different parts of the same opinion differently." *Artinian v. Berryhill*, No. 16-CV-4404, 2018 U.S. Dist. LEXIS 5988, at *21 (E.D.N.Y. Jan. 12, 2018) (citation omitted). However, "when the ALJ uses a portion of a given opinion to support a finding, while rejecting another portion of that opinion, the ALJ must have a sound reason for the discrepancy." *Id.* "While the ALJ's decision need not mention every item of testimony presented, or reconcile explicitly every conflicting shred of medical testimony, the ALJ may not ignore or mischaracterize evidence of a person's alleged disability." *Hilton v. Kajakazi*, 602 F. Supp. 3d 558, 562 (S.D.N.Y. May 9, 2022) (citations omitted). The ALJ did not mention Dr. Van Ingen's findings that the plaintiff was moderately limited in "his ability to regulate emotions, control behavior, and maintain well-being" and that his mood was "dysphoric." (Tr. 337; *see* Tr. 28.) Nor did she resolve the inconsistency between those findings and Dr. Van Ingen's opinion, other than to say that that Dr. Van Ingen's opinion was supported by "clinical examinations and testing, and [was] largely

consistent with the record as a whole." (Tr. 28.)  *See Thomas F.P. v. Kijakazi*, No. 22-CV-1519,

2023 U.S. Dist. LEXIS 222564, at *19 (D. Conn. Dec. 14, 2023) ("When analyzing medical

opinion evidence, an ALJ must *both* identify evidence that supports his conclusion and 'build an

accurate and logical bridge from [that] evidence to his conclusion.  Remand may be appropriate

where an ALJ's conclusory statements regarding supportability offer no insight into how well [a

doctor] supported and explained their opinion." (citations omitted)).

The Commissioner argues that "substantial evidence supports the ALJ's finding that

Plaintiff's mental impairments were not severe and did not result in any significant work-related

limitations," including the opinion of Dr. Alidon, the state agency psychological consultant, as

well as the treatment providers' observations that the plaintiff "had a pleasant demeanor," "intact

language skills, calculations, and memory," and "normal and appropriate mood and affect."

(ECF No. 19 at 2–3.)  However, as discussed in Part I.a, the record on the plaintiff's mental

health conditions and treatment was not sufficiently developed.

In any event, Dr. Alidon's opinion alone "cannot constitute substantial evidence" because

he is a non-examining medical expert.  *Avila v. Comm'r of the SSA*, No. 20-cv-1360, 2021 U.S.

Dist. LEXIS 149462, at *60 (Aug. 9, 2021), *report and recommendation adopted*, 2021 U.S.

Dist. LEXIS 160925 (S.D.N.Y. Aug. 25, 2021).[15]  And the observations about the plaintiff's

demeanor and affect come from the treatment providers at Healthcare Associates and Regional

Orthopedics, none of whom are mental health professionals or provided opinions on the

---

[15] Additionally, Dr. Alidon relied on the absence of psychiatric hospitalizations and the fact that the
plaintiff was not taking psychiatric medications, which was improper.  (ECF No. 19 at 3.)  "[A] person
who suffers from psychological and emotional difficulties may lack the rationality to decide whether to
continue treatment or medication," which cautions against "drawing negative inferences from a failure
to seek or pursue regular treatment."  *Cooper v. Saul*, 444 F. Supp. 3d 565, 580–81 (S.D.N.Y. 2020).
Moreover, the plaintiff reported that he sought treatment for depression, which Dr. Alidon also noted in
his report.  (Tr. 84.)

plaintiff's impairments.  Rather, their treatment records "contain only raw medical evidence from each particular visit" and "do not assess [the plaintiff's] ability to engage in competitive work on a regular and continuing basis despite [his] impairments." *Abate v. Comm'r of Soc. Sec.*, No. 18-CV-2040, 2020 U.S. Dist. LEXIS 78164, at *14 (E.D.N.Y. May 4, 2020).  This is grounds for remand.  *Pensiero v. Saul*, No. 19-CV-279, 2019 U.S. Dist. LEXIS 203743, at *12 (D. Conn. Nov. 25, 2019).

The plaintiff also challenges the ALJ's RFC determination because the ALJ relied only on the plaintiff's ability to perform "ordinary personal activities," and not on his capacity to "deal[] with the pressures of sustained, real-world employment."  (ECF No. 17-1 at 5.)  "The Second Circuit has repeatedly recognized that '[a] claimant need not be an invalid to be found disabled.'"  *Colon v. Astrue*, No. 10-CV-3779, 2011 U.S. Dist. LEXIS 88564, at *14 (E.D.N.Y. Aug. 10, 2011) (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988)).  The fact that the plaintiff could handle routine activities does not constitute substantial evidence that he was not disabled.  *Kirby v. Saul*, No. 20-CV-2270, 2021 U.S. Dist. LEXIS 175615, at *3 (E.D.N.Y. Sept. 15, 2021) ("[N]either [the plaintiff's] ability to perform personal tasks—like showering, getting dressed, and going to doctor's appointments—her 'conservative' treatment choices, nor her decision to return to work after a period of disability amounts to substantial evidence.").  If, on remand, the Commissioner intends to rely on the plaintiff's ability to handle the activities of daily living as proof of a particular fact, "the Commissioner must explain how such activities relate to the finding."  *Jennifer H. v. Comm'r of Soc. Sec.*, No. 21-CV-6234, 2023 U.S. Dist. LEXIS 55572, at *31 (W.D.N.Y. Mar. 30, 2023).

Finally, the plaintiff argues that the ALJ did not incorporate the plaintiff's mental impairments into her hypotheticals to the VE.  (ECF No. 17-1 at 6.)  The record is not fully

developed as to the plaintiff's mental impairments, so the Court cannot determine whether the

ALJ adequately supported her RFC conclusion.

## CONCLUSION

For these reasons, this case is remanded for further proceedings consistent with this

opinion.

**SO ORDERED.**

                 _s/Ann M. Donnelly_
                 ANN M. DONNELLY
                 United States District Judge


Dated: Brooklyn, New York
        March 12, 2024